**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DAN WILLIAMS,

     *Plaintiff,*

     v.

BOARD OF EDUCATION OF THE CITY
OF CHICAGO,

     *Defendant.*

)
)
)
)
)
)
)
)
)
)
)

No. 16 C 11467

Judge Virginia M. Kendall

## MEMORANDUM OPINION AND ORDER

Plaintiff Dan Williams is a school social worker for Chicago Public Schools. He sued his employer, the Board of Education of the City of Chicago, for employment discrimination and retaliation based on his gender and disability. Williams claims he was not selected for certain additional social work roles because he is male and has a disability, and that he was denied an accommodation for his disability, namely depression, anxiety, and sinusitis that prevents him from sleeping well. The Board now moves for summary judgment on each of Williams's claims. For the following reasons, the Board's motion for summary judgment [Dkt. 72] is granted.

## PROCEDURAL HISTORY

The Board moved for summary judgment on November 16, 2018. Williams's response was due on December 14, 2018. (Dkt. 71.) Williams, who is represented by counsel, did not file a response or timely request an extension of time to respond, and the Board asked the Court to grant judgment in its favor based on Williams's failure to respond. (Dkt. 75.) Of course, the Court would have been well within her right to do so at that time. *See, e.g.*, *Pierce v. Ill. Dept. of Human Servs.*, 355 F. App'x 28, 31 (7th Cir. 2009). However, in the interest of not allowing counsel's

failure to respond adversely impact her client's case in such a critical way, the Court granted Williams's request for a 30-day extension to respond, which he filed on January 11, 2019, nearly a month after his response was originally due. (Dkt. 76, 78.) But Williams again failed to respond in a timely fashion and asked for a second extension of time, which the Court granted, making his new due date January 22, 2019. (Dkt. 79, 82.) Despite the two extensions, Williams then missed his due date for a third time.

On February 5, 2019, two weeks after the deadline to respond had passed, Williams finally filed his response and asked the Court to accept the late submission due to the voluminous evidentiary record and his counsel's health issues. (Dkt. 83.) Williams's filing included 70 additional statements of fact, in violation of the local rules for summary judgment, which allow the nonmoving party to file no more than 40 additional facts unless they seek prior permission from the court. (Dkt. 83-2 at 31-45; *see also* L.R. 56.1(b)(3)(C).) The Board again asked the Court to deem its facts admitted based on Williams's late response and failure to comply with local summary judgment rules, which the Court had discretion to do. But the Court accepted Williams's late response and granted him additional time to file a statement of additional facts (limited to 60 facts) that complied with the local rules. (Dkt. 87.)

Despite being given over three months to respond to the Board's motion for summary judgment, Williams has failed to create a genuine dispute of material fact on key elements of his claims. The Board is entitled to judgment as a matter of law.

## STATEMENT OF FACTS

### I.     Williams and CPS Social Workers

Dan Williams works as a school social worker employed by Defendant Board of Education of the City of Chicago (the "Board") since September 2008. (Dkt. 74 ¶ 3.) The Board maintains

a system of schools commonly known as Chicago Public Schools ("CPS"). (*Id.* ¶ 2.) CPS social workers can be assigned to any of the Board's 600-plus elementary and high schools within Chicago city limits. (*Id.* ¶ 5.) Most CPS social workers are assigned to two or three schools. (*Id.* ¶ 6.) A CPS social worker's primary job functions are assisting students in developing coping skills, self-esteem, and improving their interactive skills; providing crisis, individual, and group intervention services; consulting with school staff, parents, and others regarding sociocultural and emotional factors impacting student learning; conducting diagnostic assessments to determine student eligibility for special education; developing Individualized Education Plans ("IEPs"); and providing professional development and leadership in developing school/community partnerships. (*Id.* ¶ 7.)

CPS schools have varying start times ranging from 7:30 a.m. to 9:00 a.m. and varying dismissal times ranging from 2:30 p.m. to 4:00 p.m. (*Id.* ¶ 14.) CPS social workers are expected to work the hours of their assigned school (*i.e.*, when the students are in attendance), so CPS social workers assigned to more than one school may have different start times on different days. (*Id.* ¶ 15.) During the 2014-2015 school year, one of Williams's assigned schools had an 8:45 a.m. to 3:25 p.m. school day, while the other school had a 7:45 a.m. to 2:35 p.m. school day. (Dkt. 74-4 at 11.) School principals provide private areas for social workers to work with students, but due to space limitations in school buildings, social workers are expected to share office space and equipment. (Dkt. 74 ¶ 16.)

Williams suffers from depression, anxiety, and chronic sinusitis. (Dkt. 89 ¶ 1.) As a result of these conditions, Williams is often unable to sleep at night, which in turn makes it difficult for him to concentrate on work tasks and negatively impacts his memory. (*Id.*) Williams's anxiety and depression make it difficult for him to accomplish tasks. (*Id.* ¶ 2.) It is important for someone

with anxiety and depression to work in a reasonably quiet workspace with adequate resources and a consistent work schedule. (*Id.* ¶ 3.) A noisy or chaotic workspace can exacerbate the symptoms of anxiety and depression, as can the "constant search for resources, including private space to serve students." (*Id.*)

## II. Williams's Accommodation Requests

On October 9, 2014, Williams submitted an accommodation request for consistent start and end times of 7:45 a.m. and 2:45 p.m. every day.[1] (Dkt. 74 ¶ 61; Dkt. 74-4 at 2.) The request stated that Williams has chronic sinus problems and clinical depression that impact his ability to sleep at night. (*Id.*) The request further stated that a consistent start time would allow Williams to have a consistent sleep pattern, which would in turn help him be more alert and focused at work. (*Id.*) Representatives from the Board's Equal Opportunity Compliance Office ("EOCO") began communicating with Williams about his request shortly after it was submitted. (*Id.* ¶ 62.) Approximately a week after Williams submitted his request, one of the EOCO representatives told Williams that his request was "a matter of convenience." (Dkt. 89 ¶ 58.) The EOCO contacted Williams's healthcare provider seeking additional information to support the request. Williams's healthcare provider responded that Williams was unable to fluctuate between two different work schedules and needed a consistent schedule to maintain a healthy sleep/work schedule. (Dkt. 74-4 at 11.) On November 14, 2014, the Board denied Williams's request. (Dkt. 74 ¶ 63.) The denial

---

[1] The record is inconsistent about the exact accommodation Williams requested. The official request form mentions only a consistent 7:45 a.m. start time and is silent as to end time. (Dkt. 74-4 at 2.) In the Board's Rule 56.1 statement of facts, the Board states that Williams requested a consistent start time of 7:45 a.m. and a consistent end time of 2:45 p.m., which Williams does not dispute. (Dkt. 89 ¶ 61.) The Board's letter denying the request states that Williams requested a 7:45 a.m. start time and that his healthcare provider later indicated that he required a consistent work schedule from 7:45 a.m. to 2:25 p.m. every day. (Dkt. 74-4 at 11.) Williams states that he never requested a 2:25 p.m. end time. (Dkt. 89 ¶ 59.) The Board purports to dispute that Williams did not request a 2:25 p.m. end time, but the evidence the Board cites to support its dispute is irrelevant and does not controvert Williams's fact. (Dkt. 95 ¶ 59.) Ultimately, despite these discrepancies, Williams does not dispute the Board's contention that he requested consistent start and end times of 7:45 a.m. and 2:45 p.m., so that fact is admitted for summary judgment purposes.

letter stated that Williams's healthcare provider did not give the Board enough information to support his request "for a fixed schedule of 7:45 a.m. to 2:25 p.m." (*Id.*; *see also* Dkt. 74-4 at 12.) The letter further stated that, in order to provide temporary assistance, the EOCO arranged for Williams to arrive at one of his assigned schools at 7:45 a.m. (even though it was an 8:45 a.m.-start school) if he wished to. (*Id.*)

On May 7, 2015, Williams submitted a second accommodation request to EOCO requesting: (1) a consistent start time of 7:45 a.m.; (2) a reduced caseload of no more than 20 students (the request was later adjusted to "the minimum caseload of students"); (3) assignment to a single school (preferably Lawndale Elementary School); and (4) removal from Prescott Elementary School ("Prescott"). (Dkt. 74 ¶ 65; Dkt. 74-4 at 16.) On June 26, 2015, the Board denied each of Williams's requests. (Dkt. 74 ¶ 67; Dkt. 74-4 at 20.) The Board's letter stated that the first request was denied for the remainder of the 2014-2015 school year, which was nearly over by that time, because social workers are required to work the hours of their assigned schools and there were no vacancies at 7:45 a.m.-start schools. (*Id.*) However, the letter also stated that the EOCO would seek opportunities to place Williams at a 7:45 a.m.-start school for the following school year. (*Id.*) The second request, for a reduced caseload, was denied because social workers are expected to support all students in a school building and a review of Williams's caseload did not support a reduction.[2] (*Id.*) The third request was denied because assignment to Lawndale

---

[2] Despite the Board's letter unequivocally stating that Williams's request for a reduced caseload was denied, the Board contends that his caseload was, in fact, reduced. (Dkt. 74 ¶ 66.) But none of the evidence the Board cites actually supports this contention. The Board cites affidavits from two of Williams's supervisors, who both state that they are not aware of any CPS social worker with a caseload of fewer than 20 students. An affidavit from a third supervisor states that Williams had the smallest caseload of any of the social workers she supervised. Finally, the Board cites two passages from an EOCO representative's deposition testimony: in the first passage, she states that she could not recall Williams's caseload for the 2015-2016 school year, but did recall that Williams felt it was too high; in the second, she states that she recalled Williams requesting that his caseload be capped at 30 students. None of this supports the Board's contention that Williams's caseload was reduced in response to his accommodation request. That fact is disregarded.

Elementary only would be part-time work based on the number and needs of students. (*Id.*) The final request was denied because Williams's removal from Prescott would create a part-time position and the Board does not have part-time social workers. (*Id.*)

On September 7, 2015, Williams submitted a third accommodation request, which included: (1) a fully functional, private office at each school with the following equipment: a telephone with private voicemail, proper light, heating and air conditioning, a high-capacity laser printer with extra ink, a private fax machine, a large high-resolution monitor, a high-capacity shredder, a high-capacity scanner, and a "proper" sized desk and swivel chair; (2) a large HEPA room filter for each office; (3) that his job performance evaluation be based primarily on Health Services Management Program ("HSMP") compliance rather than the Board's current REACH criteria; and (4) a permanent, lifelong residency waiver. (Dkt. 74 ¶ 69; Dkt. 74-4 at 24.) The Board gave Williams HEPA filters and offered him a private space with a suitable chair and table or desk at each school, but denied the other requests because they were either unrelated to his disability or did not assist him in performing the essential functions of his job. (Dkt. 74 ¶ 70; Dkt. 74-4 at 26-28, 30, 32-34.)

## III.    Williams's Performance Evaluations and Disciplinary History

The Board uses the "REACH" tool to evaluate CPS teachers and social workers.[3] (Dkt. 74 ¶ 22.) REACH evaluations are scored from 100 to 400 points, and employees can receive a REACH summative rating of excellent, proficient, developing, or unsatisfactory based on their score. (*Id.* ¶¶ 23-24; Dkt. 74-2 at 58, 64.) For the 2013-2014 school year, Williams received a

---

[3] Williams disputes that the REACH tool measures the job performance of social workers. (Dkt. 89 ¶ 22.) In support, he cites the affidavit of a former CPS social worker who was evaluated under the REACH tool and "did not believe it to be truly evaluative." (Dkt. 89-2 ¶ 6.) Williams also cites his own affidavit testimony in which he opines that REACH is not an effective evaluative tool for social workers. (Dkt. 90 ¶ 137.) "Statements of 'beliefs' or 'opinions' are insufficient to create a genuine issue of material fact." *Cleveland v. Porca Co.*, 38 F.3d 289, 295 (7th Cir. 1994).

REACH score of 268, which is in the "developing" range. (*Id.* ¶ 25.) Because Williams received a "developing" rating, he was placed on a professional development plan in December 2014. (*Id.* ¶ 26.) For the 2014-2015 school year, Williams received a REACH score of 253. (*Id.* ¶ 28.) Williams was on short-term disability leave for part of the school year and did not receive a final REACH rating. (Dkt. 90 ¶ 39.)

During the 2014-2015 school year, the Prescott principal complained to Williams's supervisor about his behavior. (Dkt. 74 ¶ 30.) Williams was placed on a Performance Improvement Plan ("PIP") as a result of his behavior at Prescott. (*Id.* ¶ 31.) A PIP is a disciplinary action that outlines each infraction and provides suggested behavioral changes to improve an employee's conduct. (*Id.* ¶¶ 31-32.) Williams's PIP, dated June 12, 2015, lists five infractions: (a) failure to perform duties; (b) insubordination; (c) policy non-compliance – students; (d) attendance abuse – absenteeism; and (e) negligence/incompetence – other duties. (*Id.* ¶ 33.) The PIP lists dozens of examples of Williams's conduct during the 2014-2015 school year, including but not limited to the following concerns:[4]

- Williams interrupted a teacher while she was teaching and during her preparation period;

- Williams did not read a student's IEP before meeting with the student;

- Williams failed to submit required documentation for a particular student, including the student's needs assessments and a copy of his calendar;

---

[4] Williams does not dispute that these examples are listed in the PIP, but he "disputes the truth" of the examples and moves to strike them. In support, he cites fourteen paragraphs of his affidavit. (Dkt. 89 ¶¶ 30, 34.) But only one of the cited paragraphs actually addresses the specific examples listed in the PIP—in Paragraph 107, Williams states that he provided a "redacted copy" of his calendar to the Prescott principal. (Dkt. 90 ¶ 107.) Paragraph 106, which Williams does not cite in support of his dispute about the PIP's contents, states that he "did not fail to review necessary information" before meeting with students. (*Id.* ¶ 107.) To the extent these two facts are in dispute, they are not material because there are many other examples of Williams's poor performance and inappropriate behavior. As to the remaining issues identified in the PIP, Williams has not cited any evidence that supports his dispute. Facts that are denied without evidentiary support are undisputed for purposes of summary judgment. *See* L.R. 56.1(a), (b)(3)(B) (non-movant's disagreements with moving party's facts "shall contain ... specific references to the affidavits, parts of the record, and other supporting materials relied upon"); *see also Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) ("[W]here a non-moving party denies a factual allegation by the [moving party], that denial must include a specific reference to the affidavit or other part of the record that supports such a denial").

- After a Prescott parent complained that she did not want Williams seeing her son any longer, Williams told her he had not read the child's IEP;

- Williams spoke inappropriately to a teacher about his personal life and spent considerable school time making personal phone calls;

- Williams did not report to work on 20 days between September 17 and February 4, failed to swipe in twice, failed to swipe out twice, failed to work the assigned hours on two occasions, and left early without authorization on one occasion;

- student, parent, and teacher complaints about Williams's conduct and work.

(*Id.* ¶ 34; Dkt. 74-2 at 67-73.)

During the 2015-2016 school year, Williams did not receive any disciplinary actions and he was removed from his professional development plan. (Dkt. 89 ¶ 24.) Neither of his principals had any problems with his job performance that year and colleagues noted his good job performance. (*Id.*) Although the professional development plan was removed, Williams was given a poor performance evaluation for the school year. (*Id.*) Patricia Pagan began supervising Williams sometime in 2016. (Dkt. 74 ¶ 20.)

## IV. Saturday and Summer Assessments

Part of the Board's duties includes conducting special education assessments of students on Saturdays and during the summer in order to create plans for students during the upcoming school year. (Dkt. 74 ¶ 48.) Each assessment team includes a social worker. (*Id.* ¶ 51.) Saturday and summer assessments are "fast paced," with two to three assessments occurring per day. (*Id.* ¶ 49.) Most of the students evaluated during Saturday and summer assessments are between two-and-a-half and five years old, are bilingual, or attend a private school in Chicago. (*Id.* ¶ 50.) When the Board selects social workers for Saturday and summer assessments, it prioritizes social workers with: (1) bilingual skills; (2) experience with early childhood students (*i.e.*, between two-and-a-half and five years old); (3) the ability to work at a fast pace; and (4) "exemplary" or "proficient"

REACH ratings.[5]  (*Id.* ¶¶ 52, 54.)  Typically, at least half, and usually more, of the social workers chosen for Saturday and summer assessments are bilingual.  (*Id.* ¶ 56; *see also* Dkt. 89-7 at 156, 13:3-16.)  Williams applied for a summer assessment position in June 2015 and was not selected. (Dkt. 95-1 at 15.)  In December 2015, Williams learned that he was not selected for a Saturday assessment position.  (*Id.* at 20.)  Williams is not bilingual and his REACH rating for the 2013-2014 school year was "developing."  (Dkt. 74 ¶¶ 53-54.)  There is a dispute over whether Williams has experience with early childhood students—the Board submits affidavits from Williams's supervisors stating that he does not have such experience, while William's affidavit states that he does.  (*Id.*; *see also* Dkt. 90 ¶ 112.)  There is a similar dispute over whether Williams was able to work at a fast pace—his supervisors' affidavits state that he could not; Williams's affidavit states that he could, "perhaps with proper accommodation depending on the circumstances."  (*Id.*)  As explained further below, these disputes are ultimately not material.  According to the Board, Williams was not chosen for Saturday or summer assessments because he did not meet the four criteria.  (*Id.* ¶ 55.)

## V.     Social Work Leads and Field Instructors

The Board selects certain social workers to be social work leads.  (*Id.* ¶ 57.)  The position is not a promotion and does not come with a salary increase.  (*Id.*)  Social work leads provide support to other CPS social workers by assisting with scheduling, grouping students, and covering a caseload when a social worker is absent.  (*Id.* ¶ 58.)  Only social workers with "exemplary" or "proficient" REACH ratings are considered for social work lead positions.  (*Id.*)  Williams applied for a social work lead position in September 2014 and was not selected.  (Dkt. 95-1 at 5.)

---

[5] Williams disputes these priorities because there are no written guidelines for selection.  But the evidence Williams cites in order to show that these are not the Board's actual priorities is irrelevant and otherwise fails to controvert this fact.

The Board also selects certain social workers to be social work field instructors. (Dkt. 74 ¶ 59.) The position is not a promotion and does not come with a salary increase. (*Id.*) Social work field instructors are expected to work with the intern program. (*Id.* ¶ 60.) Only social workers with "exemplary" or "proficient" REACH ratings are considered for social work field instructor positions. (*Id.*) Williams learned in April 2015 that he was not selected to be a social work field instructor. (Dkt. 95-1 at 11.)

## VI.    EEOC/IDHR Charges

Williams filed two charges with the IDHR and EEOC. The first, dated April 23, 2015, alleged: (1) gender and disability discrimination based on Williams not being selected to be a social work lead in September 2014 and a social work field instructor in April 2015; (2) retaliation and harassment for making ADA accommodation requests and discrimination complaints; (3) gender and disability discrimination based on Williams being required to create a schedule in 15-minute increments, being placed on a professional development plan, and being issued disciplinary notices; and (4) failure to accommodate because Williams was not given a consistent start time in October 2014. (Dkt. 95-1 at 4-12.)

The second charge, dated December 18, 2015, alleged: (1) disability discrimination based on Williams not being selected for summer assessment in June 2015 and Saturday assessment in December 2015; (2) retaliation and harassment for filing the April 2015 IDHR/EEOC charge based on Williams being returned to Prescott following medical leave, receiving a disciplinary warning, and being assigned a larger caseload for the 2015-16 school year; and (3) failure to accommodate because Williams was not given all of the accommodations he requested in May and September 2015. (Dkt. 95-1 at 14-21.)

## DISCUSSION

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine factual dispute exists if a reasonable jury could find for either party. *Pagel v. TIN Inc.*, 695 F.3d 622, 626 (7th Cir. 2012). A material fact is one that affects the outcome of the suit. *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017). To survive summary judgment, the nonmoving party must present evidence sufficient to establish a triable issue of fact on all essential elements of his case. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009). If there is no triable issue of fact on even one essential element of the nonmovant's case, summary judgment is appropriate. *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). On summary judgment, the Court construes all facts and draws all reasonable inferences in favor of the non-moving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016).

Williams alleges that the Board discriminated against him based on his disability and gender when it: (1) did not choose him to be a social work lead or social work field instructor, (2) did not assign him to work Saturday or Summer Assessment, (3) subjected him to disparate terms and conditions of employment, and (4) denied his requests for accommodation. Williams further alleges that the Board retaliated against him for requesting ADA accommodations and filing discrimination charges with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission. (Dkt. 88 at 1.)

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment" based on his sex. 42 U.S.C. § 2000e-2(a)(1). To bring a discrimination claim under the *McDonnell Douglas* burden-shifting framework, which Williams invokes, he must provide evidence that: (1) he is a member of a

protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) at least one similarly situated employee not in his protected class was treated more favorably. *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017).

Title VII also prohibits retaliation against individuals who bring discrimination charges. 42 U.S.C. § 2000e–3(a). To bring a retaliation claim under Title VII, Williams must provide evidence that: (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action by his employer; and (3) there was a causal link between the two. *Hoppe v. Lewis University*, 692 F.3d 833, 841 (7th Cir. 2012).

The ADA, as amended, prohibits employers from discriminating against a "qualified individual on the basis of disability." 42 U.S.C. 12112(a). To defeat summary judgment on an ADA discrimination claim, Williams must point to evidence sufficient to establish that: (1) he is a qualified individual with a disability under the meaning of the ADA; (2) he is qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) he suffered an adverse employment decision as a result of his disability. *Guzman v. Brown County*, 884 F.3d 633, 641 (7th Cir. 2018).

Under the ADA, discrimination also includes an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. 12112(b)(5)(A); *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 241 (7th Cir. 2018). To prevail on his failure-to-accommodate claim, Williams must show that: (1) he is a qualified individual with a disability; (2) the Board was aware of his disability; and (3) the Board failed to reasonably accommodate his disability. *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 682 (7th Cir. 2014).

## I.    Adverse Employment Action

The Board argues first that Williams's claims fail because he did not suffer an adverse employment action. "In a discrimination case, a materially adverse employment action is one which visits upon a plaintiff 'a significant change in employment status.'" *Boss*, 816 F.3d at 917 (quoting *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 235 (7th Cir. 2014)). For example, a "materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *James v. Hyatt Regency Chicago*, 707 F.3d 775, 782 (7th Cir. 2013). "Not everything that makes an employee unhappy is an actionable adverse action." *Madlock v. WEC Energy Grp.*, Inc., 885 F.3d 465, 470 (7th Cir. 2018). "Otherwise, minor and even trivial employment actions that an . . . employee did not like would form the basis of a discrimination suit." *Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012) (internal quotations omitted).

Williams claims he suffered three distinct adverse employment actions: (1) not being selected for social work lead or social work field instructor positions; (2) not being selected for summer and Saturday assessment positions; and (3) being subjected to "significantly harsher" terms and conditions of employment. Only the second constitutes an adverse employment action.

### a.    Social Work Lead and Social Work Field Instructor

The Board argues that Williams not being chosen to be a social work lead or a social work field instructor were not adverse employment actions because the positions are not promotions, as they do not come with any monetary benefits and require additional work. Williams counters that the positions allow a social worker to maintain a smaller caseload and are more prestigious titles. Neither of these facts are included in Williams's Rule 56.1(b)(3)(C) statement of additional facts

and could be disregarded on that basis alone.[6]  Even so, Williams's arguments on both points fail.

First, the evidence Williams cites does not support his contention that social work leads and field

instructors maintain smaller caseloads (and had Williams properly included these facts in his Rule

56.1 statement, the Board surely would have pointed this out).[7]  Second, while being passed over

for a promotion that comes with a raise can be an adverse employment action, *see Hunt v. City of*

*Markham, Ill.*, 219 F.3d 649, 654 (7th Cir. 2000), "being passed over for what was only a loftier

title" is not.  *Grayson v. City of Chicago*, 317 F.3d 745, 750 (7th Cir. 2003); *see also, e.g.*, *Han v.*

*Whole Foods Mkt. Grp., Inc.*, 44 F. Supp. 3d 769, 788 (N.D. Ill. 2014).  Williams not being selected

to be a social work lead or social work field instructor were not adverse employment actions and

he cannot proceed on those grounds.

### b.  Summer and Saturday Assessments

Williams next contends that not being chosen for summer or Saturday assessment positions

was an adverse employment action.  These positions are paid and can fairly be characterized as a

promotion, and so being passed over for such a position could qualify as an adverse employment

action.  *See Hunt*, 219 F.3d at 654.  But as discussed further below, Williams was not chosen for

---

[6] *See Midwest Imps., Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (holding that the predecessor to L.R. 56.1(b)(3) is "the only acceptable means of . . . presenting additional facts to the district court"); *see also Thornton v. M7 Aerospace LP*, 796 F.3d 757, 769 (7th Cir. 2015) (a "district court is within its discretion to strictly enforce compliance with its local rules regarding summary-judgment motions ... including by disregarding evidentiary documents because a required statement of facts was not filed"); *see also, e.g., Perez v. Town of Cicero*, No. 06 C 4981, 2011 WL 4626034, at *2 (N.D. Ill. Sept. 30, 2011) ("Under settled law, facts asserted in a brief but not presented in a Local Rule 56.1 statement are disregarded in resolving a summary judgment motion.")

[7] Williams cites Patricia Pagan's deposition testimony that during the 2014-2015 school year, she "wasn't afforded schools that had large [social work] caseloads because of [her] lead role and [her] role with the internship program." (Dkt. 89-7 at 40:4-8.)  First, Pagan's testimony is limited to her role as a social work lead and has nothing to do with the caseload of a social work field instructor.  Second, one witness's testimony about one position she held during one school year and the resulting impact on her caseload does not establish that all social work leads and all social work field instructors have reduced caseloads by virtue of holding those positions or that a reduced caseload is a perk of those positions.

these positions because he did not meet all the criteria for them and was otherwise failing to meet the Board's legitimate job expectations, so his claims fail on those grounds.

### c. Disparate Terms and Conditions of Employment

Williams's third contention is that he was subjected to disparate terms and conditions of employment that rose to the level of an adverse employment action. His precise allegations on this point are vague and difficult to pin down, because his argument does not cite his Rule 56.1 statement of additional facts or otherwise cite to the record. (*See* Dkt. 88 at 5.) Still, Williams claims: (1) that he was "given unjustifiably lower ratings" so that he was always subject to professional development plans, (2) that he was "refused assistance" despite repeatedly asking for it, (3) that he has been disciplined for "utilizing benefit time" available to all collective bargaining members; and (4) and that he has been "subjected to 'rules' not required of any other school social worker." (*Id.*)

As to the first claim, there are only two paragraphs in Williams's Rule 56.1 statement of additional facts related to "unjustifiably lower ratings." The first involves the 2015-2016 school year. Williams states that he did not receive any disciplinary actions that year, that he was removed from his professional development plan, that neither of his principals had any problem with his job performance, and that "others" noted his good job performance as well, but that he was nonetheless given a poor performance evaluation for the school year. (Dkt. 89 ¶ 24.) The second paragraph involves the 2017-2018 school year. Williams states, without elaboration, that Patricia Pagan's evaluation of him that year was "not justified." (*Id.* ¶ 13.) To support these facts, Williams cites his own affidavit and the affidavits of five colleagues, none of whom stated that they ever supervised Williams. (*Id.* ¶¶ 13, 24.) Neither performance evaluation is included in the record.

Williams's claims based on his performance evaluations fail for two reasons. First, Williams's performance evaluations for the 2015-2016 and 2017-2018 school years were not included in either of his EEOC/IDHR charges (nor could they have been, since the second and final charge was filed in December 2015) and so they are not properly before the Court. "Generally, a plaintiff may not bring claims under Title VII that were not originally included in the charges made to the EEOC." *Moore v. Vital Prod., Inc.*, 641 F.3d 253, 256-57 (7th Cir. 2011). Even if certain claims are not included in an EEOC charge, a plaintiff can still bring them if they are "like or reasonably related to the allegations of the [EEOC] charge and growing out of such allegations." *Id.* "Claims are like or reasonably related when (1) there is a reasonable relationship between the allegations in the charge and the claims in the complaint and (2) the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Chaidez v. Ford Motor Co.*, --- F.3d ----, No. 18-2753, 2019 WL 4050996, at *4 (7th Cir. Aug. 28, 2019) (quoting *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)). To be "like or reasonably related," the relevant claim and the EEOC charge "must, at minimum, describe the same conduct and implicate the same individuals." *Moore*, 641 F.3d at 257.

Williams brought his EEOC charges in April and December 2015, and it is undisputed that Pagan did not begin supervising Williams until sometime in 2016. Pagan's actions in 2016 and beyond could not possibly be implicated in Williams's 2015 EEOC charges, so his discrimination claims stemming from Pagan's 2017-2018 performance evaluation specifically, and her actions more generally, are not reasonably related to the 2015 EEOC charges and the Court will disregard those claims. The same is true for Williams's performance evaluation for the 2015-2016 school year. *See, e.g.*, *Cervantes v. Ardagh Grp.*, 914 F.3d 560, 565 (7th Cir. 2019) (complaint was not reasonably related to EEOC charge describing different allegations, time period, and individuals);

*Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 602 (7th Cir.2009) (suspension was not like or reasonably related to the allegations in an EEOC charge because it occurred after the EEOC charge and was, therefore, not foreseeable to the employer); *Conner v. Ill. Dep't of Nat. Res.*, 413 F.3d 675, 678-80 (7th Cir. 2005) (EEOC allegation of racial discrimination based on 2001 non-promotion not like or reasonably related to claim based on 2002 non-promotion).

Second, even if claims stemming from Williams's 2015-2016 and 2017-2018 performance evaluations were properly before the Court, "[u]nfair reprimands or negative performance reviews, unaccompanied by tangible job consequences," do not constitute adverse employment actions. *Boss*, 816 F.3d at 919. The same is true of being placed on a performance improvement plan. *Id.*; *see also Davis v. Time Warner Cable of Se. Wisconsin, L.P.* 651 F.3d 664, 677 (7th Cir. 2011) ("Performance improvement plans, particularly minimally onerous ones like that here, are not, without more, adverse employment actions.") Williams does not point to any "tangible" job consequences that were tied to his negative performance reviews or professional development plans, and those acts, without more, do not constitute adverse job actions.

Next, Williams claims that he suffered an adverse employment action when he was "refused assistance despite repeatedly asking" for it. Again, Williams's brief does not cite any facts to support this single-sentence argument, but his Rule 56.1 statement of additional facts includes multiple instances in which he requested accommodations and the Board denied them in part. (Dkt. 89 ¶¶ 6, 9, 21, 36-40, 44, 58-60.) As discussed further below, the Board did offer Williams reasonable accommodations and attempted to address his requests. "It is the employer's prerogative to choose a reasonable accommodation, and the [Board's] decision to accommodate [Williams's] request in a way other than what he requested was not an adverse employment action." *Koty v. DuPage Cty., Ill.*, 900 F.3d 515, 520 (7th Cir. 2018) (citing *Jay v. Intermet*

*Wagner, Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000)); *see also See Hancock v. Potter*, 531 F.3d 474, 478–79 (7th Cir. 2008) (concluding actions taken by the employer to try to accommodate the employee's work restrictions were not adverse).  And Williams's claims as to the requested accommodations the Board denied all otherwise fail for the reasons discussed further below.

Williams also claims that Pagan disciplined him for utilizing benefit time that was available to all collective bargaining members.  He does not cite any facts to support this argument, but this appears to stem from incidents involving Pagan in September 2017.  (Dkt. 89 ¶¶ 33-36.)  For the reasons explained above, these claims were not included in Williams's EEOC/IDHR charges and they do not reasonably relate to those charges, so they are not properly before the Court.  Finally, Williams claims that he was subjected to rules not required of any other school social worker.  This argument is similarly unsupported by citations to the record, and the Court cannot identify any facts in Williams's Rule 56.1 statement of additional facts that are related to this contention.  *See Boss*, 816 F.3d at 914 (district courts are not required to "scour the record looking for factual disputes" or "piece together appropriate arguments").  To the extent Williams is referring to the requirements of his PIP or professional development plan, those do not constitute adverse employment actions.  *Davis*, 651 F.3d at 677.  For these reasons, none of the "disparate terms and conditions of employment" Williams lists in his brief rise to the level of an adverse employment action for purposes of a Title VII or ADA discrimination claim.

## II.    The Board's Legitimate Job Expectations

The Board next argues that Williams's claims fail because he has not shown that he was meeting the Board's legitimate job expectations.  Williams's only viable adverse employment action is that he was not selected for summer or Saturday assessment positions.  The Board contends that Williams was not chosen because he did not meet the Board's four criteria: (1)

bilingual skills; (2) experience with early childhood students (*i.e.*, between two-and-a-half and five years old); (3) the ability to work at a fast pace; and (4) "exemplary" or "proficient" REACH ratings. Williams argues that there are genuine issues of material fact as to each criterion.

As noted above, the parties dispute whether Williams had experience with early childhood students (Williams says he did; the Board says he did not) and whether he could work at a fast pace (Williams says he could; the Board says he could not). Williams also points out that the Board selected some social workers for summer and Saturday assessments who were not bilingual. But those disputes are not material, because it is undisputed that Williams did not meet the REACH ratings required for summer and Saturday assessments. It is also undisputed that Williams was failing to meet the Board's legitimate job expectations separate and apart from these four criteria, given that his conduct was the subject of multiple complaints and disciplinary issues during the 2014-2015 school year (which Williams cannot dispute) that culminated with him being placed on a PIP. Whether or not Williams met the four criteria is not the entire inquiry, as he suggests—the Court's "analysis of an employer's legitimate expectations does not merely consider whether a plaintiff's actual job performance was satisfactory—it is a much broader analysis, which allows fact-finders to consider factors such as insubordination and workplace camaraderie." *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014) (holding that satisfactory performance evaluations did not establish that plaintiff was meeting her employer's job expectations in light of multiple disciplinary actions around the time she was terminated). Williams purports to dispute the conduct included in the PIP, but the evidence he cites in support of his dispute does not actually controvert those facts, as noted above in footnote 4. Facts that are denied without evidentiary support are admitted for summary judgment purposes, and Williams's "admission to the conduct at issue prevents him from establishing that he was meeting the [Board's] legitimate expectations."

*Tomanovich v. City of Indianapolis*, 457 F.3d 656, 666 (7th Cir. 2006). Because Williams cannot show that he was meeting the Board's legitimate job expectations, his *prima facie* discrimination case fails and the Board is entitled to judgment as a matter of law. *Id.*

## III. Failure to Accommodate

To prevail on his failure-to-accommodate claim, Williams must show that (1) he is a qualified individual with a disability; (2) the Board was aware of his disability; and (3) the Board failed to reasonably accommodate his disability. *Yochim v. Carson*, 935 F.3d 586, 590 (7th Cir. 2019). "The accommodation obligation embodied in the third prong brings with it a requirement that both the employer and the employee engage in a flexible 'interactive process' and make a 'good faith effort' to determine what accommodations are necessary." *Id.* (citing *Lawler v. Peoria Sch. Dist. No. 150*, 837 F.3d 779, 786 (7th Cir. 2016)). Williams must make an initial showing that the accommodations he sought were reasonable on their face. *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 493 (7th Cir. 2014).

The Board contends that it offered Williams reasonable accommodations, and that the requested accommodations it denied were not related to Williams's disability and would not have assisted him in performing the essential functions of his job or were otherwise not reasonable. Williams counters that the Board denied his reasonable requests, that it "never understood" his disabilities or accommodation requests, and that it never engaged in the interactive process.

Williams twice requested adjustments to his work schedule—initially a consistent work schedule of 7:45 a.m. to 2:45 p.m. every day, even though one of his assigned schools had a later start and end time, and later a consistent start time of 7:45 a.m. While the Board denied the request because it did not have enough information from Williams's healthcare provider, the Board nonetheless offered to arrange for Williams to arrive at his late-start school at 7:45 a.m., which

would have given him the consistent start time (and thus the consistent sleep schedule) he sought. The Board also stated that it would offer Williams a spot at another 7:45 a.m.-start school when a spot became available. Though the Board did not offer Williams the precise accommodation he sought, they offered him an alternative accommodation that was entirely reasonable and would have addressed his limitations. To comply with the ADA, an "employer must provide a reasonable accommodation, not the accommodation the employee would prefer." *Yochim*, 935 F.3d at 591 (summary judgment was appropriate where employer offered "alternative options" that "reasonably addressed" the employee's concerns).

As for Williams's request that he be reassigned to a single school, the Board's duty to reassign Williams as an ADA accommodation "extends only to vacant positions," and the record shows that there were no single-school vacancies at the time of Williams's request. (Dkt. 74-4 at 21); *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 856 (7th Cir. 2015) ("an employer is not required to bump other employees to create a vacancy so as to be able to reassign the disabled employee," and "it is the employee's burden to demonstrate that a vacant position exists"). Similarly, Williams's request that he be removed from Prescott was denied because there were no vacancies at 7:45 a.m.-start schools to reassign him to. (Dkt. 74-4 at 21.) Perhaps the Board could have removed Williams from Prescott and reassigned him to a later-start school, but it is Williams's burden to demonstrate that a vacant position existed, and he has not done so. *Dunderdale*, 807 F.3d at 856; *see also Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 482 (7th Cir. 2017).

Williams also requested that his caseload be reduced to no more than 20 students, and he later changed the request to a "minimum" caseload. The Board rejected the request because social workers are required to service the needs of all students at their schools and actual student needs

can vary over time, so a set caseload cannot be guaranteed, because a review of Williams's caseload did not "support" a reduction, and because a caseload of 20 students or the "minimum" number of students "may not require the full time services" of a social worker. (Dkt. 74-4 at 21.) The Board argues that this amounted to a request for "light duty" and was thus unreasonable as a matter of law. *See, e.g., Majors v. Gen. Elec. Co.*, 714 F.3d 527, 535 (7th Cir. 2013) (a proposed accommodation that seeks "another person to perform an essential function of the job . . . is, as a matter of law, not reasonable"); *see also Gratzl v. Office of Chief Judges of the 12th, 18th, 19th, and 22nd Judicial Circuits*, 601 F.3d 674, 680 (7th Cir. 2010) ("an employer need not . . . strip a current job of its principal duties to accommodate a disabled employee[,] [n]or is there any duty to reassign an employee to a permanent light duty position") (internal citations omitted). Though "job restructuring" can be a reasonable accommodation, that includes "modifications such as: reallocating or redistributing *marginal* job functions that an employee is unable to perform because of a disability; and altering when and/or how a function, essential or marginal, is performed." *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 289-90 (7th Cir. 2015) (citing EEOC guidance) (emphasis added). Servicing student needs is undoubtedly an essential function of Williams's job, (*see* Dkt. 89 ¶ 7), and so the Board is correct that his request to serve "no more than 20 students" or a "minimum" number of students is akin to requesting "light duty," an accommodation the Board is not obligated to provide under the ADA. *Gratzl*, 601 F.3d at 680; *see also, e.g., Corrales v. Westin Hotel Mgmt.*, No. 17 C 6868, 2019 WL 1762907, at *6-8 (N.D. Ill. April 22, 2019).

Williams's claim as to his remaining accommodations requests fails because he has not shown that the accommodations would have allowed him to perform the essential functions of his job. *See Brumfield v. City of Chicago*, 735 F.3d 619, 633 (7th Cir. 2013) ("reasonable accommodations" are "workplace adjustments that enable an individual . . . to perform the essential

functions" of their job) (citing 29 C.F.R. § 1630.2(o)(1)(ii)).  The Board largely denied Williams's supply-related requests and in doing so, it noted that Williams had adequate access to phones, printers, fax machines, shredders, and scanners at each of his schools.  (Dkt. 74-4 at 27.)  A letter from William's psychiatrist accompanying the request notes that Williams having access to these tools in a single office location would "significantly reduce [his] workplace stress by allowing him to perform his job more efficiently."  (Dkt. 89-3 at 22.)  The letter similarly notes that Williams's request to be exempted from the Board's REACH evaluation process and instead be evaluated using different criteria "will help reduce stress" and "assist [Williams] in focusing on serving the students."  (*Id.*)  It also notes that Williams's request for a permanent, lifelong residency waiver is "due to the psychological stress of the student populations he serves in the inner city, as well as the stress of city life" and that "[Williams] also believes the smog in the city exacerbates his sinus conditions."  (*Id.*)

Though each request is generally geared toward stress reduction, Williams does not identify which essential functions he was unable to perform as a result of these stressors (some related to his workplace, some not), nor does he establish how these requested accommodations would have allowed him to perform those essential functions.   "To be entitled to an accommodation, a disabled employee must have a physical or mental limitation that prevents her from performing an essential function of the particular job at issue and 'there must be some causal connection between the major life activity that is limited and the accommodation sought.'" *Brumfield*, 735 F.3d at 633 (quoting *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 785 (7th Cir. 2007)). Here, Williams does not identify which essential functions he was unable to perform due to stress, nor does he connect the dots as to how his requested accommodations would allow him to perform those functions, so his failure-to-accommodate claim fails.  *See also, e.g.*, *Hooper v. Proctor*

*Health Care, Inc.*, 804 F.3d 846, 852 (7th Cir. 2015); *Sheahan v. Dart*, No. 13 C 9134, 2015 WL 1915246, at *5 (N.D. Ill. April 23, 2015).

Williams's request for an emotional support animal is not properly before the Court because it was not included in his EEOC/IDHR charges and is not reasonably related to them. *See Cervantes*, 914 F.3d at 565. Finally, to the extent Williams argues that the Board failed to reasonably accommodate him because it did not understand his disabilities and failed to engage in the interactive process, that is not a basis for ADA liability on its own. *Bunn*, 753 F.3d at 683 (there is no separate cause of action for failure to engage in the interactive process). And the record shows that the Board did, in fact, engage in the process—the Board's letters regarding Williams's requests outline the discussions between the Board, Williams, and his lawyers and healthcare providers. (Dkt. 74-4 at 11-13, 20-22, 26-28, 39-41.)

## IV.     Retaliation

To avoid summary judgment on his retaliation claims, Williams must present evidence that, considered as a whole, would allow a reasonable juror to conclude that "(1) he engaged in protected activity; (2) he suffered a materially adverse employment action; and (3) there was a causal link between the protected activity and the adverse action." *Boss*, 816 F.3d at 918. Using the *McDonnell Douglas* framework, Williams can meet his burden by showing that, in addition to engaging in protected activity and suffering a materially adverse employment action, "he was meeting his employer's legitimate expectations; and . . . he was treated less favorably than similarly-situated employees who did not engage in protected activity." *Id.*; *see also Zegarra v. John Crane, Inc.*, 218 F. Supp. 3d 655, 671 (N.D. Ill. 2016).

"In the retaliation context, determining whether an action is materially adverse means inquiring whether it well might have dissuaded a reasonable worker from making or supporting a

charge of discrimination." *Boss*, 816 F.3d at 918 (citing *Burlington N. Sante Fe. Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). "Because Title VII does not set forth a general civility code for the American workplace, its anti-retaliation provision does not protect against petty slights, minor annoyances, and bad manners. An employee must suffer something 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Id.* (quoting *Hobbs v. City of Chicago*, 573 F.3d 454, 463-64 (7th Cir. 2009)).

Williams points to four purported adverse actions that he claims were based on a retaliatory animus. (Dkt. 88 at 19-21.) Each of Williams's arguments fails and none of the actions he cites rises to the level needed to trigger retaliation liability. First, Williams argues that he was placed on a professional development plan a few months after he applied for ADA accommodations and was later given a poor performance review. But Williams does not point to any "tangible job consequences" accompanying the professional development plan or bad review, and "unfair reprimands or negative performance reviews" unaccompanied by such consequences are not adverse employment actions for Title VII retaliation purposes. *Boss*, 816 F.3d at 919 (performance improvement plan, on its own, is not an adverse employment action). Next, Williams notes that he received a "pre-disciplinary notice" hours after he asked if his disabilities were considered as part of his REACH evaluation. But Williams does not provide any citations and this incident is nowhere to be found in his Rule 56.1 statement of additional facts. "[C]onclusory assertions do not constitute evidence" and cannot overcome summary judgment. *Id.* Third, Williams points to the fact that his ADA accommodations requests were denied. Though denial of requested accommodations could be an adverse action, *see, e.g., Bilinsky v. Am. Airlines, Inc.*, No. 16 C 4253, 2018 WL 4181481, at *9 (N.D. Ill. Aug. 31, 2018), *aff'd on other grounds*, 928 F.3d 565 (7th Cir. 2019), Williams has not shown a causal link between his protected activities (making

accommodations requests and bringing discrimination charges) and the Board's decision to deny his requests—indeed, as discussed above, the Board made an effort to provide some reasonable accommodations and denied Williams's remaining requests because they were not reasonable as a matter of law or would not have assisted Williams in performing the essential functions of his job. Finally, Williams argues that Patricia Pagan's actions while supervising him beginning in the fall of 2016 and continuing through the 2018-2019 school year were overly harsh and punitive, in retaliation for his June 2016 accommodations request. The June 2016 request and Pagan's ensuing actions postdate Williams's 2015 EEOC/IDHR charges and thus are not properly part of this action. And Williams cannot show that his claim stemming from the June 2016 accommodations request or Pagan's conduct is like or reasonably related to his earlier charges, because the 2016 claims do not "describe the same conduct and implicate the same individuals." *Moore*, 641 F.3d at 257.

Because Williams cannot show a causal link between the one viable adverse employment action he identifies and his protected activities, his *prima facie* retaliation case fails and the Board is entitled to summary judgment as a matter of law.

## CONCLUSION

For these reasons, the Board is entitled to summary judgment on each of Williams's claims and the Board's motion for summary judgment [Dkt. 72] is granted.

Virginia M. Kendall
United States District Judge

Date: September 24, 2019